We'll go, we'll start with you, Ms. Franklin-Vest. Thank you, your honors, and may it please the court. I am Elizabeth Franklin-Vest, and I'm here on behalf of David King, the personal representative for the estate of the murdered inmate, John Tully King. The issue in this case is really a narrow one. Does a jury get to decide liability in this case, or was it appropriate for the magistrate judge to do so? And respectfully, your honors, we submit there remain abundant issues in this case that properly should be resolved by jury, and that summary judgment in favor of the defendants was improper. You know, the facts of this case are very important. I mean, normally we dive right in and just talk law on it, but there are some facts in this case here that drives the whole determination, in my opinion, and maybe you ought to delve a little bit into the facts of it, at least in terms of understanding it. And, you know, we've read all the briefs and records that are here, but it really seems like it's an incredible case, from my perspective, of what occurred here. And I don't quite understand how it occurred, so maybe that'll be helpful to me, because I'm still trying to wrap my head about how does this happen in a prison, in a mental prison unit? It's just mind-blowing, but I don't want to move it further than that. No, I mean, and that's exactly right, Your Honor. So speak a bit, just a minute or two, on the facts. Make sure we're all in agreement as to what those facts are. Okay, so on April 7th of 2017, in the Intermediate Care Services Ward of Kirkland Correctional Facility, which is a high-security area, and that intermediate care area is where the mentally ill, sort of more than kind of your garden-variety mental illness that you see in the general population, but sort of a more mentally ill. You have a reason for putting them in this unit, because of demonstrated mental illness of some sort? Yes, and that's correct, Your Honor. All of these people in here are mentally ill and in prison. And in prison, and you also have sort of low-level offenders in the same security area as the level three high-security inmates. What does that mean? That means someone who's maybe a felon or a murderer is all together. Murders and rapists are in there. They all have a mental condition. With forgery people and sort of less aggravated and violent crimes. So all of these people are in the same area. There are two ward keepers in this area, both of whom were serving sentences for double homicides. Do you think, I just want to make sure I understand, and I'll just stay with the facts, but it just struck me. Would it ever be permissible for a prison to use ward keepers in this type of a facility? Like in this, where we're talking about? I mean, I would argue that's sort of inherently dangerous policy decision to make. I mean, I don't know that there's anything that... And do you also think that if somebody has a past of violence, that they can't be made a ward person? I think that is just simply common sense. I think if somebody has got a past history of extreme violence, that person has no business. What's a ward keeper? So a ward keeper is somebody who kind of generally has access... By somebody, you mean an inmate? Well, an inmate, I'm sorry. One of those inmates, that they're in prison and mentally ill, is chosen to do what? So they get to sort of tend to the area by way of... So they're out of their cell from 6 a.m. to 6 p.m. Unattended and largely unregulated, it seems, correct? Exactly right. And one of these two ward keepers was not just violent in the past, but in the immediate past. Had tried to kill his cellmate fairly recently. Yes. And then these two ward keepers murdered four other inmates in the span of two and a half hours. Yes, three and a half hours. On the defendant's watch. Yes, yes, Your Honor. All right, let's make sure we all agree in terms of the facts. Judge Richardson brings great points, I think. I'm just trying to understand it. We have inmates, and these two have tremendous violent pasts. They are mentally ill or something's wrong, and they're still in a high-security place, and they are made ward keepers to do what, to how? I mean, what do they do? I understand they walk around, nobody looking at them? They walk around with, well, somebody's supposed to be looking at them, but I mean, they have free range of this area. It looks like no one could have been looking at these. No, absolutely not. They murdered four people, exited that ward, and turned themselves in into a separate building. And the first murder happens at what time? I'm sorry, it was shortly after. 7 o'clock in the morning? Yes, Your Honor. And they continue and commit four, entice four different individuals into their cell, kill them, put them under the bed, and only by 10.30 or so do they walk over and tell someone. No one came found them. Exactly, Your Honor. This is the most incredible set of facts, I must say. I could absolutely imagine in a prison setting, but I don't want to go there. I don't want to pretend to own the facts because the law controls this case. And that's, I mean, it could be incredible as heck, but it doesn't mean they don't prevail because the law controls this case, but I want to make sure we have the facts straight. Well, those are the facts, Your Honor. And, you know, sort of the gravamen of our argument here is that there remain a number of genuine issues, a material fact that ought to be properly- Going to the law intertwined with the facts, I understand based on the allegations in the complaint that Sergeant McCann, who was supposed to be doing security checks, that is walking by the cells and checking that everything was secure, walked by this cell where four inmates were killed four times during the span of this time that the inmates were being killed, correct? That is accurate. And that's alleged in the complaint. But as to the other defendants, what specific allegations are there to the other defendants that they had knowledge or failed in some way? Well, so after there had been like a hostage situation in that particular area back in 2015, they installed some video cameras as one of their security measures. And so there are a number of kind of issues about who was supposed to be monitoring those video cameras. I mean, who's supposed to be seeing some of this dereliction that's happening. And so that was really sort of the- Video cameras don't go in the cell. They wouldn't know what's happening in the cell. You're saying that they should have seen McCann, was it McCain or McCann? McCann. Whichever, wasn't doing his job? Yes. I mean, I think, you know, again, the reason for- Help me out, just connect that to me for deliberate indifference purposes, right? Sort of, you know, knowledge of a substantial risk of serious harm and- That's exactly right. I mean, I'm adding you got a great negligence case, right? But what I'm trying to understand is for, mainly for the others, but for McCann too, like why do we go from negligence, which seems abundant supply here, to deliberate indifference? Well, so if we start with sort of McCann on the deliberate indifference- Maybe start with the others and then come back to McCann. McCann might be easier. Start with the others. Okay, so on the other ones, again, you know, the purpose of having these cameras is to ensure the security of this area. There are a number of issues about like who was supposed to be monitoring this and why, what they're supposed to be doing. And of course, there's a lot of sort of conflicting information about that. But I mean, so the issue here though, is that they had sort of noticed that there were, that something had happened in this area and that there should have been some sort of shaking out about who should have been monitoring this, the level of it- Which is all these other defendants as a whole, you're saying should have been monitoring the video cameras? I mean, those who were in various supervisory roles. I mean, yes. And again, when you look at the record in this case, it's not very clear who had those responsibilities. I think probably in part because once SLED came in and began to conduct their investigation, SEDC just stopped doing any sort of, you know, looking into this. So I believe it goes back to a jury question, frankly, about who had sort of the role of monitoring this. But it goes back to the complaint too. Where in the complaint do you identify any personal knowledge or failures on the part of any of these other defendants other than McCann? Your Honor, maybe while they are giving their presentation, I will go back and sort of review that and see if I can give you an answer, Your Honor. In the context, I guess I want to just make sure that I understand the argument as best I can. I mean, I understand you just said they should have done better, right? Like they should have watched the video. They should have seen McCann wasn't doing his job. They should have told McCann to do his job, right? But should I have is negligence, right? Should have, could have, you know, like all of those are phrases that were like, negligence, right? Like you might have a Federal Torch Claim Act case, or not federal, but you might have a State Torch Claim Act. I don't know whether you do or don't. That's none of my business, right? But my point is that that sounds like negligence and there's plenty of that. But I don't, that's not enough, right? I think you acknowledge that's enough. Help me get to how I go from negligence. They should have known better. Well, absolutely. And they did know better. So I want to say, you know, I think our claim against McCann is much stronger than against sort of these other members who should have been monitoring the camera. But I think a lot of that really needs to be sort of resolved at the trial level, because there was a lot of sort of lack of information, forthcoming information on the part of various, you know, actors. Well, your complaint has to get past this stage before it ever gets to the trial level, which is why we're asking you about the allegations that they had knowledge. And that's what you say you're going to identify on rebuttal? Absolutely, Your Honor. But I mean, as to sort of, you know, You were here earlier, right? We talked a little bit about Iqbal, right? I mean, you got to tell, I mean, I guess there are two problems, right? One, you got a lot of negligence totally with you, right? At least at an allegation stage. But I'm having a hard time other than McCann understanding, like, how it's specific to an individual and then how it gets over from negligence into deliberate indifference. Sure, absolutely, Your Honors. But if we can go back and speak a little bit about what McCann knew, because he is, of course, the gentleman who was walking around the areas and who just did not see what was happening. Right, and let's assume that you did identify enough in your complaint to, clearly, he walked by four times while four different people were getting murdered and did not do, obviously, an appropriate security check. How do you get beyond the qualified immunity? The qualified immunity, so, I mean, he doesn't get beyond qualified immunity because, I mean, it's clearly established that officers have a duty to protect inmates from other inmate violence. I think that is a well-established- That's clearly established, right, that you're under Farmer v. Brennan. Yes, Your Honor. Now, I mean, you're going to be very hard-pressed to find another case where there were four inmates who were murdered on a watch. Again, sort of very egregious facts here, but that doesn't mean that- But the question we're asking is not that, right? The question we're asking is whether it's deliberate indifference to not look in every cell, right? I mean, what we're trying to figure out is whether his conduct, right, that is the failure to look in every cell when you're doing a walk-around, is deliberate indifference. And what I can't, I haven't seen any case that suggests to me that might be negligent, right? It's plainly not doing his job very well, right? I'm totally with you, right? But what I don't see is any law that tells me that that's deliberate indifference. Well, I mean, again, when you look at sort of the situation in that particular area and the obvious risk that existed there, that if security checks were not being appropriately conducted, that the risk was just so clear that something like this would happen. Again, the dereliction is just so indescribable that it's not surprising that there isn't a case that is on all fours. Does the context matter? Does the context of where it is, and Judge Richardson's question, I mean, if you're dealing with a bunch of teenagers you have in a place and you're not watching them like you should and something occurs, I mean, dealing with inmates who are mentally ill, who are violent offenders, who you know this to be so. And I mean, it's in the system, it's right there. And you don't watch them, and well, just negligence. A reasonable person in this circumstances would have taken a look, but it's not a matter of deliberate indifference because there's not a substantial risk. I don't think if we had such here next to this court, and there were people we allowed to walk around, not a one of us in here would be safe as a judge, or anybody thinking you want those people coming in and out of your office, cleaning it. And I don't know if it's different in the prison context, but there seems to be something a little bit more here. I understand the law is controlling it in terms of where we go, but. I mean, that's exactly right. Prisons are. Negligence, it really, I mean, really kind of, once you read the facts, it's like, wait a minute, where is this? I mean, and that's exactly right. I mean, it was an inherently dangerous situation. Anyone with any amount of common sense would have understood that. I mean, they had had a hostage situation there not too long before. They had increased their security based on these cameras because of that prior incident. I mean, it was clear that this was an inherently dangerous situation. They had murderers who were responsible for unfettered access to this particular area. Do you think the reasonable response would have been to have a 23-hour lockdown in that facility? Is that the basic take-home, is that you gotta have 23-hour lockdown? If you've got violent, mentally ill people, I mean, that strikes me as sort of what you're suggesting, and I obviously think that's wrong on a host of levels. Yeah, no, I think there's quite a large- We want to encourage both rehabilitation and sort of, we want to encourage some degree of sort of autonomy, and prison ought not to be a 23-hour lockdown facility. Absolutely. But drawing that line seems really hard here, and if I'm a warden, and this is deliberate indifference, then I don't know why I don't adopt a 23-hour lockdown for mentally ill, violent offenders. Well, I mean, if they had had personnel who were trained and were performing their responsibilities adequately, it may be completely possible- Right, and Director Sterling would say, right, that like, I don't have the funding to do that, I don't have that, and so my only option in your world is the 23-hour lockdown. So that's the, like, take-home we ought to take out of it? No, I don't think so. I mean, there are a number of, you know, sort of possibilities in how to- If you add to the warden, he'd already had some, he had some restraints on what he could do. I mean, there had been some actions taken against that sort of thing, so it wasn't like the warden when he was trying to respond to it. I'm not getting on the warden with this sort of situation, but I think what's key here is that deliberate indifference goes to the question of whether or not there's a risk, so obvious. And when you put it in this so obvious category, then you look at, you've got some ward keepers up here giving the kind of people out and kind of supplies, extension cords and all, walking around, not even looking at them for a long time, and they do this. I, maybe, I mean, maybe just a court session, maybe just what you write it down and say, that's negligence, and it becomes negligence. But I don't know, it doesn't, it's just, it's something maybe we'll let the others address and we'll let you come back on and talk about. Thank you, thank you, your honors. We've teed it up for you, so we'll now thread it here from the appellee's lawyers. And I see three of you are going to be speaking, so be mindful of your time constraints. You may freely exchange your time or give a little, you know, you've seen that done at the games, you can have a little, well, they do it in Congress all the time, you can, if you want to do that. I can't even get this mic covered up. Thank you, your honor. May it please the court. My name is Skip Harden. I'm with the McKay Firm in Columbia. I represent one of the defendants, Sergeant Dwayne McCann. With me at council table is Daniel Plyler, who represents eight of the other staff at SCDC. And also with us is Dave DeMasters, who represents Damian Jones, one of the co-defendants, a correction officer in this case. Your honor. Why don't you start with, when we talk about actual knowledge, right? We talk about the knowledge of Mr. McCann, or Sergeant McCann, I'm sorry, I don't mean to be, but McCann's actual knowledge of these two individuals' prior criminal background. I mean, it seems like there are lots of things that these folks have done, but we gotta show that, and the complaint has to show, that McCann knew about them, right? It's like his actual knowledge, not what he should have known. Yes, sir. Can you talk about what the evidence, or what the record, the complaint shows, that McCann actually knew about these two inmates? Your honor, the complaint is fairly sparse in terms of what McCann actually knew. The four breakdowns in the complaint accuse him of knowing a long history of overcrowding and issues. I don't mean what he knew about the prison. What did he know about these two inmates? Very little. I mean, there's nothing in the complaint that talks about what he knew. In fact- He knew they had mental illness. Well, yes ma'am. He knew they were violent. Well, no ma'am, no ma'am. How did he know? No ma'am, he did not. Can you let me finish, or not? Yes ma'am. He had responded to an incident with Simmons before, and had to use chemical spray on Simmons. One time, your honor. And doesn't the complaint also allege that Simmons and Phillips, that these defendants knew that Simmons and Phillips had said they were gonna kill somebody because they wanted the death penalty? The complaint alleges that, your honor, but there's no evidence at all in the record that that is in fact true. Because we haven't had discovery yet. Yes ma'am, we had. Oh, I'm sorry, this is gonna be difficult. Go ahead, you go ahead. I'm sorry, Judge Thacker. We've had enormous amounts of discovery. There were 30-something depositions. That's right, I'm sorry about that. I was confusing it with the other case. So you go ahead. Thank you, Judge. Judge Richardson, the issue here is not even actual knowledge. There's no record evidence. It's sort of the proverbial farm animal in the forest looking for the truffle. There's nothing there in terms of actual knowledge for Mr. McCann. In fact, the only thing that there is in his deposition. Is there any suggestion that he knew that these two individuals had been committed a violent crime? No, sir. I mean, he said. Because there are other inmates that are in the prison that are forgers. Yes, sir. He does know that they have some degree of mental illness. Yes, sir. They've been stepped down from the mental health hospital they've been stepped down from the most serious mental illness hospital into this facility which is the sort of secondary mental health facility. I see it's the intermediate level. Right. Yes, sir. But in his deposition. The two men that committed these, what did they do? What were they in prison for, the two? These two individuals who killed the four individuals in this, well, not in this case. There's only one murder in this case, Judge, that we're dealing with. There were four murders. I understand that. I just want to know what the two, what were they in prison for? They were in prison for murder. Both of them were in prison for double murders. So the individuals are brought into this facility, the people who supervise them and know, at least watching them, they aren't told whether this is a person who is a forger or a double murderer? No, sir, they're not. Mr. McCann's, Sergeant McCann's testimony in his deposition says he did not know. He did not know why they were there and he had never had any trouble or issues with them. There's no differentiation in the treatment of a totally non-valid felon and one who is connoblected, who's being put in, who's mentally ill, psychopathic murderer, comes into this facility and you don't know that that person is that kind of a person as opposed to just a forger. And you are the person who is their supervisor? The correction officer will not know exactly why they're in prison. Well, I mean, if they're Hannibal Lecter, they might be housed in a high-level mental illness. Judge, I don't want to get off track with extreme examples. I use that to say, basically, it didn't matter who they were. You don't tell the people there at all who this person is and what he's done in the past? Your Honor, I represent Mr. McCann. He said he did not know and had never had trouble and issues with these defendants. Was he having this kind of report on Simmons? Under oath, yes. This was in that report as a sergeant on Simmons some four months before these murders. That was in 2016. He didn't know then? No, sir, he did not. His testimony says he did not know. And in fact, Judge Thacker, the jail incident that you mentioned was in 2015, and that was not at SCDC. That was when he was in the county jail when he threatened to kill his roommate. SCDC didn't know that. Where was the incident where chemical spray had to be used? That was at SCDC. Was that with Sergeant McCann? No, sir. I mean, no, ma'am. All right, did Sergeant McCann know what the purpose of the security check was? Yes, ma'am, there's a great deal of testimony about the security checks and what's supposed to happen. He testified that they were supposed to happen every 30 to 40 minutes, and that he was trained that he was supposed to make a round and look in the windows and also look at other things that are going on on the yard. These ward keepers who were appointed by the counselors, not Mr. McCann, he didn't have anything to do with their being appointed ward keepers and did not control who would be ward keepers. Who are the counselors? What's their role in the prison? Counselors are technically security officers, but they are mental health counselors, and they have an office right there in the sally port between the two, the A wing and the B wing. And they're making judgments about who would be a good ward keeper based on what information they've got. Exactly, Judge Richardson, just who would be, they make the recommendation about who would be the ward keeper. And they're not named in the complaint? These two ward keepers are not named. And those counselors made the decision, not Mr. McCann, about the fact that none of them. That's what it sounds to me. Sounds like to me, you wouldn't tell anybody anything. I'd tell anybody anything if you feel like, you know, when you have an instance like this, you wouldn't even tell anybody what anybody is convicted of, risk of the danger of anything, and none of the keepers or any of it, because you don't want to create a situation where they know something. Well, no, Your Honor. You go to court and say, okay, you got all these, you got two guys who are double murderers, who you make ward keepers, and you give them cords and everything to walk around with. Don't you tell that guy watching, or anybody else, and there's no incentive to do it. And if something happens, then we'll be able to say, well, you didn't know about it. Well, Your Honor, I believe, of course, that SCDC, who is the defendant in the state case on the negligence issues, they would have known, obviously, the history of these, to perpetrate it. In terms of, from the governmental side or from the prison side, why tell anybody anything? Why? I mean, if this is the standard, that you're going to come to court and say, well, no, there's no evidence he even knew that this guy was, that he has in prison. Now, I got it. If I'm sitting on the outside, and I see a guy working on a chain gang, I don't know what he's convicted of. But if I'm sitting there, standing up there, you know, watching over him, I would sure like to know, is this guy a forger or is he a double murderer? And you're saying, don't tell him. And if you don't tell him, then you come here and then, there's no deliberate indifference, because he didn't know. Your Honor, the counselors knew. I mean, there's no incentive, is what I'm saying. You'll get off it every time. Counselors knew. No one mentioned it to McCann, because I don't think, quite frankly, it was relevant. You should. And what I'm saying, you should mention it. They should not mention it, if they don't want to incur potential liability that something happens as a result of him not watching over him, doing certain things. Why tell him? Well, Your Honor, the issue in this case is whether the deliberate indifference, whether there is enough that stacks up against Mr. McCann. There's no actual knowledge, so we have to turn to circumstantial evidence. And the circumstantial evidence in this case is, he didn't know that these two individuals were going to do this. He didn't know their history. He had never had, other than just a minor incident with either of them, had never had any trouble with them. They didn't actually want to do what they did. In fact, what they did was psychopathically, to be honest with you. These are guys, not what they did. They didn't went and told you. The other guys, in effect, came and said, hey, you want to go check our cell? We, you know, there's a place, thank you. They had nothing to lose. There's another thing. I mean, if you've got prisoners who have absolutely nothing to lose, can it come to your mind that this guy can do what he wants to do in here, and you can't do anything more to him? Your Honor, back to Judge Richardson's point, then we would be to the point of having to lock inmates down 23 hours a day. I don't think that's warranted. But you could inform people around them. You don't have to go to the extreme of 24 lockdowns. You could have told Mr. McCann, look here, these guys are really bad guys here, and they're going to be going around with these courts, and they have committed these murders. Keep an eye on them. That's not 24-hour lockdown. That's keep it up. Now, in other words, what was the time period? From 7.30 to what? About 10. The only time frame that matters in this case, Your Honor. I understand it from your client, because you stood up first, don't you? All the defendants. But I want to answer my question. What was the time frame for the first murder? The first murder was they went into the cell at 7.49. And the time that they inform you was? So they informed them three hours later. Three hours. And four times during that time period, Sergeant McCann passed by the cell. One time, Your Honor, 10 minutes after the first murder took place, he walked by the cell. I'm sorry, Your Honor, I'm out of time. The issue with the security check is, as the judge in this district court judge in this case said, there is no policy violation here. There's no written rule or anything related to that security check. That does not rise to the level of different. Just one question. I want you to have the opportunity to respond to opposing counsel's argument about qualified immunity and Farmer versus Brennan. Can you respond to that? Yes, ma'am. In this case, it's all, y'all just decided the Washington versus Columbia Housing Authority case, and you were talking about the first murder or your free pass murder. In this case, this doesn't even get anywhere close to that. There's no deliberate indifference. There's no, under the second prong, there is no constitutional violation here. Qualified immunity is appropriate in this case. Thank you, Judge. Thank you, Mr. Harden. We'll hear from Mr. Plyler. Plyler, is that you? Thank you, Judge Wynn, Judge Thacker, Judge Richardson, may it please the court. My name's Daniel Plyler. I'm from Columbia, South Carolina. I represent, we've been terming the supervisory defendants. I think that's the best way to think about it. So I have eight of the appellees. I would like to mention that the appeal has essentially been abandoned as to force. Four of them, just as basically a housekeeping matter. Specifically, Garvin, Presley, Whitaker, and Brown are not even mentioned in the appellant's briefs. With regards to the other four, they're clearly, and as this court's well aware, these are derivative claims. These are supervisory liability claims that have been brought against these respondents. And it's a derivative claim, according to Evans v. Talmers and the long history in this court. So I have to kind of argue about both, because if you don't have the underlying constitutional injury, you can't even get to the supervisory liability claim. And in this case, the appellants have failed, despite lengthy discovery, to come up with evidence that would support a deliberate indifference claim. And I would point your honors to a plethora of cases that have already been decided by this court. You've got Rich v. Bruce from 1997. You've got Danzer v. Stansberry. You've got Strickland v. Housley. All of those have dealt with situations, essentially, where a correctional officer made a negligent decision during the course of his duties that unfortunately resulted in someone being harmed. And all of those cases resulted in murders. It's telling when you look at the case law in that situation and then compare it to these facts. Would you say there are inherent risks that would lie in a facility with the kind of, you've kind of said it over and over again, what it is about. Are there inherent risks here of allowing court keepers, double murderers, to have this and to go around, walk around, and nobody sees them or monitors them for hours? Your honor, first, there are inherent risks in prisons in general. I wonder about this. Well, and I'm happy to. In this facility. Thank you, your honor. In which these two individuals are known convicted violent offenders, one of which adds up recently. Is there inherent risk here that differs from being in an office building? In an office building, yeah, there are. But not in a prison. And one, even in a regular prison situation. No, and if I may respond. I actually handled the P&A lawsuit that they referenced in one of the orders that they tried to attach into this record on appeal, where the ICS unit was discussed at great length. And there's an inherent misconception going on here as to what the ICS unit is. The two individuals in this case were guilty but mentally ill. That's how they were judged. That means they were not having their mental illness treated and it caused them to commit the crimes that they came to prison for. Their mental illness was being treated. It was being treated in the ICS program. So to sit here and suggest that the fact that these two individuals, over a period of time, systematically killed four people, walk into the office and say, go look, you don't think that even a common person can say that's a mentally ill person? Your Honor, they were cold calculated, premeditated, planned that they had made. You think they were cured or didn't no longer have that mental state that caused the initial crime because they were under treatment? Actually, if you compare Jacob Phillips' initial crimes to what he did on April 7th, 2017, I think anyone would see that, yes, he is now coherent and calculated. And if I'm- Calculated and easy in which the way he did it, it was, I tell you, it's about as calm as anything you ever seen. It was like you had no feeling whatsoever about it. And you just walk across the building to another building. You walk in and it says, hey, you guys might wanna go and check that room over there. Well, actually- You don't think that manifests mental illness that someone, if you think you treated something, you really didn't treat anything? Your Honor, if I may. Please. In the record, you'll see, it's Dr. Schwartzwatt's report. Phillips' original crimes were through command auditory hallucinations. He was hearing his mother tell him to kill people. In the jail, over two years before this happened and before he even came to SCDC, as Judge Thacker pointed out, he did attack another inmate. Again, readily admitting that he was having command auditory hallucinations. That was being treated. This, these murders that they decided to commit that day were not a product of that mental illness and the record's clear on that. These are cold calculated plans, just like happen, unfortunately, across this country every day. My question is really going to, if you know what you know, what you just said then, are these still individuals you gonna put in that kind of a setting? Not only with what they did, but for hours. You don't know what they're doing. Your Honor, if I may, if you watch the surveillance video, which is, you have it, you have the video, this idea that they're not being watched at all is quite frankly untenable. Just watch the video. Sergeant McCann is doing his rounds. Sergeant McCann is interacting. It was not untenable, because they did four murders over three hours and you can look at a video all you want, but there's gotta be something wrong in a setting of this sort. Four murders, calculated over three hours, and you won't be looking at a video and says, oh, they're being watched. The murders did not take three hours. That's a factual distinction that bears being worded out here. I don't know how long. Well, and I'd also like to say there's their own statements on the issue and you do have a certified statement from Simmons. We probably wouldn't have known about these murders for quite a while, I guess, until the end of the day if they hadn't walked in there to tell you, right? Your Honor, if I may, Simmons' statement actually says they knew that count, that they were about to come around and the cells would be checked at count and therefore that was their last opportunity and they left at that point. So they knew they were gonna be caught. Before he said that? Not to the level that it happens at count. That's what the records were plead on. A different level of checking. Correct. It'd be like, basically, use the school example. There are times when the students- Let's stay in this prison unit or this mental facility with these two violent crime situations in which they commit these murders over a period of time. Let's stay right there. Right. Which, by the way, my people, there's no evidence I had any knowledge of whatsoever. But you've got a policy that allows this to happen. Is there any evidence that your clients had a role in choosing the ward leaders? I forgot their name. Whatever they are. The ward? Ward keepers. Ward keepers. Essentially, they're custodians and I see I'm about to run out of time. A ward keeper is actually the lowest job you can get in a prison. And it's the extension cord issue that your Honor has mentioned, Judge Wynn. The records were plead. Any inmate in general population can buy an extension cord. They're allowed to have them in their cell because of where the outlets are so they can use them. You know, sometimes we do say things. I want you to keep in mind. We're gonna read that record. So if I said something that probably isn't quite in the record, I'm not gonna hold you to that. Okay? We're just having a conversation. But ultimately, for purposes of this, the record is gonna control it. We're not gonna do anything in opinion that we don't find in the record. So you can feel comfortable about that. To answer Judge Richardson's question directly, the record is replete that my clients had nothing to do with choosing who was a ward keeper. In fact, the record clearly shows the unit manager who was Jennings, who they knew, the plaintiff knew about and chose not to name him. The unit manager controlled the ICS program. Jennings and unit counselor Sims would have had input on that as well as the ICS program manager, Kim Jones, none of which were named as defendants, two of which were not even deposed by appellant, but that my clients would have had no role in making those decisions. And then on qualified immunity, if I may, and I know I'm over time, I think this case, if you even get to the supervisory liability claim, which I think the law says you can't get there with my clients, they would have to be entitled to qualified immunity in this situation. I mean, very similar to what happened in the Pinehurst case. We'd be now changing the framework of how we're gonna analyze this type of claim and it would be patently unfair to then judge the actions of the supervisors in retrospect. Thank you, Your Honor. Thank you, Mr. Fowler. Thank you for your argument today. Mr. McMasters, is that right? Yes, Your Honor. Thank you, Judge Wynne. I appreciate it. I would happily give some of my time away if I need to. I was very brief. I've got a lot of time to give to anybody. I'm not gonna give it to you. That is correct, Your Honor. There's a reason for that. I represent Defendant Damien Jones. He was the officer assigned to the A wing. These, the murder of Mr. King happened on the B wing. So to the extent there's any allegations of deliberate indifference for failure to protect Mr. King, I think those allegations fail because Mr. Jones wasn't there. What Mr. Jones did do is he got the call when Mr. Simmons, you know, once they went up and said, hey, y'all need to go check out this cell. He got the call. The call went to Mr. McCain and Mr. Jones. Mr. Jones went over from the A wing and opened up the cell door and saw one body on the ground that was blue in the face who was not Mr. King, and then discovered two bodies who were laying on the bed that also was not Mr. King. Mr. King had been strangled and stuffed under the bed. I'm not trying to be crass. It's 749 that morning. And Mr. Jones didn't get there until approximately 1030 later. All those other cases have been settled, haven't they? That's correct, Your Honor. It's the only one you got that's out there. Correct, Your Honor. This is the only case we have is the estate of Mr. King. Mr. King was the first one who was murdered at 749. And some of the allegations- I don't know the terms, but it seems like to me, I don't know, maybe just for humanitarian, I don't know. I'm just throwing it out there. I sure wish we didn't have to decide this case. Well, Your Honor, if I could convince Plains Counsel to take the money we offered, we wouldn't be here. All right. I'm not going to touch that at all. But- I'm not going to touch it. Judge Richardson, do you have questions? Judge Becker, any parting remarks you'd like to give us? Just that Mr. Jones and Mr. McCain even saw Mr. King who was under the bed when they arrived there. So the allegations against Mr. Jones were essentially we failed to provide life-saving care. We failed to provide CPR. And there's no evidence because Mr. Jones testified in his witness statement. He didn't even know Mr. King was underneath the bed. So they didn't see him. That's all. Thank you, Your Honor. Ms. Franklin-Bash, you have a few minutes. I'm going to give you the same statement I said. I sure wish we didn't have to decide this case. But I'll tell you how it's going to go when it's up. Sure wish we didn't. That gives you guys any message whatsoever on either side. Well, I will relay that message back to you, Trial Counsel, Your Honor. I just want to address a couple of issues regarding McCain's actual knowledge. One of the things you'll notice about this record is that when it came to the issue of who actually made these guys ward keepers, it was like a game of hot potato. Like absolutely nobody would own up to it. Our position is that it is a question of fact for the jury to decide whether or not McCain actually knew. I mean, he was in charge of security. Is there evidence here to suggest that McCain made these two guys ward keepers? No. There's a material dispute of fact on that issue. I don't know who made. I don't know that he would have had the power to make them ward keepers, but whether or not he knew. You just started. I'm sorry. You just started by saying there's some confusion about who made them. And then you said McCain, McCain. There's no evidence in the record that McCain made that decision. If I was imprecise in my language, I apologize. I mean, we don't know exactly who made them. But we know it wasn't or there's no evidence to support that McCain made that decision. No record. There's no evidence of that. But whether or not he actually knew. There was the evidence that he knew their background. That would be a reasonable inference from his position as being in charge of security on that area. But there's no evidence in all the discovery that came out. There's no evidence that he had any of that knowledge. I mean, he denied that he had the knowledge. And you didn't put in any evidence that he did have the knowledge, right? There was no pattern of practice. There was no, the prison gives this information to everybody. There's no, you know, we write on their door if they're murderers. None of that. Reasonable inference. We also know that there were some meetings among people who were working in that area about the ward keepers and about people who were working there. So, I mean, again, I think it's a jury. It's whether or not they believe him. Testify that he told or we discussed that this individual had certain psychological or criminal history backgrounds. No, although we do know from the program director, Ms. Jones, and she made some interesting remarks about one of them. She was at one point, but she's definitely one of the witnesses. To get to a jury, you have to get beyond the qualified immunity. So you have to, what is the right that was clearly established to get beyond qualified immunity? I mean, the fact that a prisoner, that the institution has the duty to prevent prisoners from being attacked and assaulted by other prisoners. Well, in your briefing here, you just say that the right at issue is the Eighth Amendment right. I mean, the case law suggests that it must be a more particularized right than that to get beyond, for it to be clearly established. What did you, did you argue just the Eighth Amendment below? I'm sorry, Your Honor. I mean, I intended to argue, so the Farmer v. Brennan, that that is what we need to determine. I mean, page 41 of your brief says, in this case, the right at issue is the victim's Eighth Amendment right to be free from cruel and unusual punishment. And that's all you say. You agree that's not specific enough? I agree that that is, should have been perhaps better, more carefully worded, but I don't think that that is sort of fatal to the claim. I mean, I think it's well-established that Mr. King, in this case, had a right to be free from being murdered by the inmates here. I mean, the ICS storm at Broad River Correctional Facility, I mean, it was a tinderbox. It was waiting to explode, and on April 7th, 2017, it did. Was it Broad River or Kirkland? I'm sorry, Kirkland, which is sort of the same area, I'm sorry, on Broad River Road. The officers, I mean, specifically McCann, were deliberately indifferent to the safety of their charges, and it was obvious to the officers that an inmate death would occur if they didn't do their very minimal duties of observing the prison cells when they were conducting their security checks. Respectfully, Your Honors, I mean, the plaintiff asked this court to reverse the grant of summary judgment in favor of the defendants and allow this case to proceed to trial. Thank you, Ms. Franklin-Bash. Thank you, Mr. Harden, Mr. Gleila, Mr. Masters, South Carolina folks. As we've said, normally we come down to shake your hand, so you're getting a virtual shake today. We'll get it sometime in the future. Again, I want to thank the students from Veritas School here in Richmond, the high school students, along with their teachers, Mr. Robert Luckey III and Mr. Andrew Smith for observing the arguments today. It normally, I would say, the judges would hang around and talk to you, but you pick Friday, and I'll tell the teachers, don't pick Friday again, because it'll be on Friday because we come from different states. Judge Thackers from West Virginia, I'm North Carolina, and South Carolina here. All with significant travel to take at the end of this case, and we didn't go on back, so we're gonna leave and move on back, but we invite you to come back and be a part of it. Hope you learn something here. You got these lawyers here. You're free to talk to them. I'm not giving them away, if you want to, but they have significant travel, too, and they won't, I'm sure, we wouldn't talk to you about anything specific about the case. What you saw today were the arguments of the case. The judges will now go back in conference. We will now decide on how we're gonna go on the cases preliminarily. We will decide on which of us will take the lead in writing those cases, and then over the period of the next few weeks, sometimes months, sometimes a little longer, we will ultimately render an opinion in this case, and the opinion will discern the issues here and give an outcome. What happens from there? The counsel know it could go to the full court. They don't like it. Sometimes that happens, or the next step is to the United States Supreme Court. Once the United States Supreme Court speak on it, end the ball game. We don't argue with it. We don't question it. We just accept whatever the United States Supreme Court says. If we say it here, and it doesn't go anywhere, then within these five states, you don't question it. You just accept what you said at this court for the five states, whether you like it or not, but that's how our court system works. We respect the system, and we hope that we've done at least a good idea to demonstrate to you we give both sides the opportunity to speak, and that will await where we are. Thank you for being a part of us today. Let me ask either judge, do you have anything to say to the students since we won't be able to stay? All right. Take care.
judges: James Andrew Wynn, Stephanie D. Thacker, Julius N. Richardson